UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

------------------------------------x

| | |
|---|---|
| In re | Chapter 11 |
| BRITESTARR HOMES, INC., | Case No. 02-50811 (AHWS) |
| Debtor. | |
| BRITESTARR HOMES, INC. and OAK POINT PROPERTY LLC, | Adv. Proc. No. 07-05020 |
| Plaintiffs, | |
| v. | |
| CITY OF NEW YORK, | April 11, 2007 |
| Defendant. | |

------------------------------------x

### DECLARATION OF STEVEN E. SMITH IN SUPPORT OF EMERGENCY APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

I, Steven E. Smith, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am the President of debtor Britestarr Homes, Inc. ("Britestarr" or the "Debtor") and the President of Oak Point Property LLC ("OPP"), the "Successor" entity under Britestarr's confirmed Second Amended Plan of Reorganization (the "Plan"). I submit this declaration in support of Britestarr's and OPP's emergency application for a temporary restraining order and application for an order enjoining the City of New York (the "City") from condemning the

Debtor's 28-acre parcel of land located in Hunts Point, Bronx, New York (the "Property") that is the lynchpin to the success of the Plan.

**Background**

2. On June 29, 2004, this Court confirmed the Plan. A copy of the Plan is attached hereto as Exhibit A.

3. Before the confirmation of the Plan, the City participated in the Debtor's bankruptcy case by filing several proofs of claim and actively participating in the reorganization process. The City did not object to confirmation of the Plan and, in fact, voted in favor of the Plan. After confirmation, the City moved to revoke confirmation of the Plan pursuant to Section 1144 of the Bankruptcy Code, but later withdrew that motion. Further, the City supported the Debtor's motion to enlarge the time in which certain conditions precedent to the Closing Date under the Plan were to occur.

4. Under the terms of the Plan, the Property, which is the Debtor's principal asset, is to be transferred to OPP on the "Closing Date" (defined below). Plan ¶ 7.2. In exchange, OPP is to contribute sufficient funds to make all cash payments to creditors called for by the Plan. *Id.* ¶ 7.3.

5. The Closing Date is to occur when four conditions are satisfied: (1) the order confirming the Plan becomes a final, non-appealable order; (2) all claims against the Debtor's estate are resolved by final order; (3) a remediation plan for the Property is approved by the New York Department of Environmental Conservation ("NYDEC"); and (4) OPP has obtained plan financing. Plan ¶ 7.4.

6. On December 5, 2006, this Court approved an agreement (the "Settlement Agreement," a copy of which is attached hereto as Exhibit B) between the Debtor and the City

that resolves the Debtor's objections to the City's claims against the estate. In addition to resolving the City's claims, the Settlement Agreement also obligates the City to "use all reasonable efforts to assist [Britestarr] in satisfying the conditions of the Closing Date as set forth in the Plan, and in otherwise implementing the provisions of the Plan." Settlement Agreement ¶ 6.

7. With the approval of the Settlement Agreement, the first three conditions necessary for the Closing Date have been satisfied.

8. Over the course of several years, OPP has obtained offers to provide the plan financing, which would satisfy the final condition for the Closing Date. As described in the Second Amended Disclosure Statement of Britestarr Homes, Inc. (the "Disclosure Statement," a copy of which is attached as Exhibit C), it was originally contemplated that OPP would develop the site as an electricity generating facility. *See* Disclosure Statement at 6-7. At the time, there were a series of public reports issued indicating that New York City was in serious need of additional power generation, and the New York Power Authority ("NYPA") later issued a request for proposals ("RFP"). A viable power plant project would provide the necessary plan financing. To that end, OPP engaged in negotiations with various energy companies, including KeySpan Energy Development Corp. ("KeySpan") and NRG Energy, Inc., that were interested in financing and developing a power plant project on the site. In May 2005, OPP even entered into an option agreement with KeySpan that granted KeySpan an option to purchase 13 acres (less 3 acres of air rights) of the Property for $42 million if KeySpan won the NYPA bid. KeySpan was informed in January 2006 that it was being seriously considered by NYPA as the winning bidder under its RFP. OPP has also negotiated other possibilities for the commercial development of the site with other interested purchasers, investors and developers.

**The City's Wrongful Conduct**

9. Unfortunately, despite its awareness of the need for new power generation and that the success of the Plan depends on the commercial development of the Property, the City has undertaken certain actions that have scared off potential purchasers, investors and developers of the Property and has thereby interfered with OPP's and Britestarr's ability to obtain plan financing and consummate the Plan.

10. Specifically, over the course of the last year, the City has threatened to condemn the Property for the purpose of constructing a prison. These threats have become an actual public proceeding in the months since the Settlement Agreement was executed. However, the City's plan to acquire the property for a jail existed even while the Plan was being developed. Since being made public, and particularly in the last few months, this condemnation threat has loomed like a cloud over the Property. The City's threats caused both KeySpan and NRG to back out of any participation in the power plant project, and have made it nearly impossible for OPP to market the Property in an economically viable fashion.

11. Initially, beginning in 2004, OPP met with City officials, including Deputy Mayor Dan Doctoroff and the management of the New York City Economic Development Corporation ("EDC") and presented its plans for the power plant on the Property. Based on comments made by City officials, OPP agreed to scale back the power project to make room for a jail on a portion of the Property, which would be built after the power project was built.

12. In December 2005, however, the City indicated to OPP that it could not obtain approval for the jail if another portion of the Property were being used for the power plant.

13. In April 2006, the City announced the City's plans to build a 2,000-bed jail on the Property.

14. In June 2006, KeySpan decided not to continue to pursue the power plant project, citing the City's opposition to the project, although it was willing to transfer the project to another developer.

15. OPP and KeySpan then began discussions with NRG, which conducted due diligence and was very interested in pursuing the project.

16. On July 31, 2006, however, a City official responsible for energy issues informed NRG that the City was going to "kill" the power plant project by condemning the entire Property. The City official had subsequent discussions with NRG in which he continued to dissuade NRG from pursuing the project.

17. In August 2006, NRG informed me that it had decided not to pursue the power plant project solely because of the City's competitive plans for the Property.

18. In the months since NRG's withdrawal, the City, even while negotiating and executing the Settlement Agreement that obligates it to assist in implementing the Plan, has continued to threaten its intent to condemn the Property, both publicly and directly to OPP representatives. While I had hoped and expected that the City would honor its agreement to assist the Debtor "in satisfying the conditions of the Closing Date as set forth in the Plan," my hopes and expectations were subsequently dashed when the City intensified its condemnation threats.

19. On February 8, 2007, with no prior notice to Britestarr or OPP or permission from this Court, the City issued a public notice, a copy of which is attached hereto as Exhibit D, and formal documentation concerning its plan to acquire the entire Property to develop a prison on the Property, and is in the process of scoping a Draft Environmental Impact Statement pursuant to applicable laws and regulations. A public hearing on this issue is currently scheduled for

April 16, 2007. If that hearing goes forward, the condemnation will appear to the public – and to potential investors in the Property – to be a *fait accompli*, destroying the Debtor's and OPP's ability to obtain financing and consummate the Plan.

20. Despite OPP's best efforts, the City's condemnation threats and its actions to pursue a possible prison project have made it impossible for OPP to find an investor willing to invest in or develop the Property in an economically viable fashion. Several potential investors, purchasers or lenders who once expressed interest in the Property have informed me that, in light of the City's condemnation threats, they are no longer interested in the Property. For instance, on February 27, 2007, a prospective investor, Pantheon Properties, advised me by email that the public hearing notice issued by the City caused Pantheon to withdraw from any further consideration of providing the funding necessary to consummate the Plan. Similarly, attached hereto as Exhibit E is a March 20, 2007 letter from Barken Realty Corp., offering to purchase nine acres of the Property for $19.8 million, but only if the City would agree to condemn only that portion of the Property that it actually needs for purposes of a prison. The City's threats, therefore, make it impossible for OPP to obtain financing sufficient to fund the Plan and, in turn, interfere with the consummation of the Plan.

21. Under the Court's current orders, the Closing Date must occur on or before June 5, 2007, or else the Property must be sold at auction. An auction – assuming that it generates any bids at all – will undoubtedly yield far less for the Property than could be obtained in the absence of the City's threats. I have discussed the situation with a professional auctioneer who has advised me that OPP is unlikely to obtain any reasonable offers for the Property.

22. Moreover, if the Closing Date fails to occur, the Debtor's agreement with NYDEC – which compromised NYDEC's claim against the estate and significantly reduced the

environmental liability attached to the Property – will become void and of no force or effect. OPP spent several years and more than a million dollars to obtain a site closure agreement with NYDEC, yet the City's condemnation plans expressly contemplate revisions to the site closure plan and would discard all of OPP's efforts. The revived environmental liability would greatly increase the magnitude of claims against the estate and further impair the Debtor's ability to dispose of the Property for any meaningful amount. Similarly, the Settlement Agreement with the City provided that the City's tax claim would be reduced only if payment is made on the Closing Date.

23.     Given the length of time that the City's land use review procedures will take, there is no chance that the City's condemnation threat will be resolved before the June 5, 2007 deadline, and thus the City's actions will necessarily preclude the Closing Date from occurring and will cause the Plan to fail, resulting in harm to Britestarr, OPP, and Britestarr's creditors.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 11th day of April, 2007.

_____
Steven E. Smith

100115704_8.DOC