# **EXHIBIT C**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## BRIDGEPORT DIVISION

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| BRITESTARR HOMES, INC., | : Case No. 02-50811(AHWS) |
| | : |
| Debtor. | : |
| | : March 31, 2004 |

## SECOND AMENDED DISCLOSURE STATEMENT OF BRITESTARR HOMES, INC.

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT AND THE DISCLOSURE STATEMENT AND ACCOMPANYING PLAN OF REORGANIZATION ARE SUBJECT TO MATERIAL MODIFICATION.**

BRITESTARR HOMES, INC.

Melissa Zelen Neier, Esq.
Federal Bar No. 25055
Ivey, Barnum & O'Mara, LLC
170 Mason Street
Greenwich, CT 06830
Phone: (203) 661-6000
Facsimile:    (203) 661-9462
Email: mneier@ibolaw.com

## INTRODUCTION

Britestarr Homes, Inc. ("Britestarr" or the "Debtor") owns a 28 acre parcel of real property in the Bronx, New York (the "Oak Point Property"). The Oak Point Property is encumbered by the following: (a) tax liens of the City of New York Department of Finance in the claimed amount of over $10,300,000 (the "City Tax Liens"); (b) a mortgage in favor of Galea & Kruse in the claimed amount of over $1,200,000 (the "Galea & Kruse Mortgage); and (c) an obligation to perform environmental remediation and pay certain penalties, claimed by New York State's Department of Environmental Conservation (the "DEC Remediation Claim"). While the DEC has filed a proof of claim in the amount of $17,000,000.00, the Debtor believes that remediation of the Oak Point Property will cost less than $7 million, and that the penalties to be paid to the DEC will not exceed $450,000. These estimates are based on the Debtor's ongoing settlement discussions with the DEC.

The liquidation value of the Oak Point Property at a bankruptcy or foreclosure auction is insufficient to pay the alleged encumbrances against the Oak Point Property. Britestarr proposes this plan of reorganization to insure that the creditors of Britestarr receive a full distribution on their claims.

This proposed plan of reorganization provides for a restructuring of Britestarr to resolve, currently and in the future, the City Tax Liens and the DEC Remediation Claim, and for payment of unsecured creditors in full.

The defined terms in the proposed plan of reorganization are applicable to this Disclosure Statement, unless the context requires otherwise.

## DISCLAIMERS

THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE GREATEST AND EARLIEST POSSIBLE RECOVERIES TO THE DEBTOR'S CREDITORS AND THAT CONFIRMATION THEREOF IS IN THE BEST INTEREST OF ALL PARTIES. ACCORDINGLY, THE DEBTOR RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.

THE DEBTOR BELIEVES THAT THE RESOLUTION EMBODIED IN THE PLAN, INCLUDING THE DISTRIBUTIONS TO BE MADE TO ITS SECURED AND UNSECURED CREDITORS UNDER THE PLAN, IS IN THE BEST INTEREST OF THE DEBTOR AND ITS CREDITORS. ACCORDINGLY, THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS. THE DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. IT IS IMPORTANT THAT YOU READ THIS DISCLOSURE STATEMENT CAREFULLY.

THIS DISCLOSURE STATEMENT CONTAINS A BRIEF SUMMARY OF THE PLAN AND A COPY OF THE PLAN IS CONTAINED IN THE MATERIALS FORWARDED TO YOU ALONG WITH THIS DISCLOSURE STATEMENT AND IS ON FILE WITH THE CLERK OF THE BANKRUPTCY COURT FOR INSPECTION. THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN MAY BE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT SET FORTH HEREIN. CLAIMANTS AND OTHER PARTIES AFFECTED BY THE PLAN ARE URGED TO READ IT IN FULL AND TO CONSULT WITH LEGAL COUNSEL OR OTHER PROFESSIONALS OR ADVISORS AND WITH EACH OTHER IF DEEMED

APPROPRIATE IN ORDER TO FULLY UNDERSTAND THE CONTENTS AND RAMIFICATIONS OF THE PLAN. THE PLAN, ONCE CONFIRMED, REPRESENTS A LEGALLY BINDING AGREEMENT AMONG THE DEBTOR, CLAIMANTS AND INTEREST HOLDERS.

UNLESS OTHERWISE SPECIFICALLY STATED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR AND HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. THE DEBTOR HAS MADE EVERY EFFORT TO INSURE THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS ACCURATE IN ALL MATERIAL RESPECTS. HOWEVER, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT ALL OF SUCH INFORMATION IS ACCURATE. NEITHER THE BANKRUPTCY COURT NOR ANY PARTY IN THIS CHAPTER 11 PROCEEDING HAS PASSED UPON THE ACCURACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

NO REPRESENTATION OR WARRANTY CONCERNING THE DEBTOR IS AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OF THE PLAN WHICH CONTAIN INFORMATION OTHER THAN AS SET FORTH OR PROVIDED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON IN ARRIVING AT YOUR DECISION. ANY SUCH ADDITIONAL REPRESENTATIONS OR INFORMATION AND INDUCEMENTS SHOULD BE REPORTED IMMEDIATELY TO THE DEBTOR'S COUNSEL.

**THIS DISCLOSURE STATEMENT AND THE PLAN MAY BE MODIFIED BY AMENDMENT FILED WITH THE BANKRUPTCY COURT.**

# PART ONE

## BRITESTARR'S HISTORY, BANKRUPTCY, ASSETS & LIABILITIES

**I.    SUMMARY OF THE PLAN.**

A.    The Mechanics of the Plan.

The Plan shall be implemented by the transfer of the Oak Point Property to a successor entity (the "Successor"). The creditors of Britestarr will receive cash in the full amount of their Allowed Claims, or such other treatment as the Debtor and each claimant may reach. All such agreements will be subject to Bankruptcy Court approval. The transfer of the Oak Point Property and the payments to creditors will occur on the Closing Date.

B.    Summary of Classifications under the Plan

Set forth in detail elsewhere in this Disclosure Statement is a description of the technical aspects of the classification and treatment of Claims and Interests under the Plan (see Part Two, Section III), the methodology for making distributions pursuant to the Plan (see id.), the risks inherent in the Plan, and the applicable tax consequences of the Plan (see Part Two, Section V). However, a broad overview of what the Claimants and holders of Interests will receive under the Plan may be helpful in considering whether to accept or reject the Plan.

To assist you in determining which Class of Claims or Interests your Claim or Interest falls into, and the treatment of each class, a reference table is set forth below. Table 1 is a summary only, and is subject in all respects to the Plan.

**TABLE 1**

**QUICK REFERENCE GUIDE TO CLASSIFICATIONS AND TREATMENT OF
CLAIMS AGAINST AND INTERESTS IN THE DEBTOR**

| Class Number | Description | Summary of Treatment |
|---|---|---|
| Unclassified | Administrative Claims | 100% in cash on the Closing Date or pursuant to an agreement by the administrative claimant and the Debtor. |
| Unclassified | Priority Claims | 100% for tax claims under § 507(a)(8) in equal quarterly installments within six years of the dates of assessment, and for other priority claims, 100% in deferred cash payments of a value as of the Consummation Date in the Allowed Amount, or 100% (including interest) in cash on the Closing Date in accordance with §1129(a)(9). |
| 1 | City of New York Department of Finance | The Allowed Amount of the Claims of the City of New York, if any, will be paid on a monthly basis over six years bearing interest at the statutory rate of 18% compounded daily, or pursuant an agreement between the City of New York and the Debtor. |
| 2 | Galea & Kruse | The Allowed Amount of the Claims of Galea & Kruse, if any, will be paid on a monthly basis over ten years pursuant to a twenty year amortization schedule, with a balloon payment on the 121st month, or pursuant to an agreement between Galea & Kruse and the Debtor. |
| 3 | Unsecured Claims – Three creditors with claims totaling approximately $30 million | Class 3 Unsecured Creditors will waive any distribution from the Bankruptcy Estate in exchange for contingent payments from the Successor and its affiliates in an amount no greater than the amount of each such Class 3 Claim, or a different treatment pursuant to an agreement between a claimant and the Debtor after Bankruptcy Court approval. |
| 4 | Unsecured Claims - approximately 9 creditors with claims totaling approximately $600,000 | Class 4 Unsecured creditors will receive cash in the full amount of their Allowed Claims within 20 days of the Closing Date or the date of Allowance, whichever is later, with interest at the federal judgment rate of interest applicable on the Petition Date. |
| 5 | Environmental Remediation Claims of the State of New York | The Debtor will perform the acts required by the New York Department of Environmental Conservation (the "DEC") and will pay penalties due and owing to the DEC in accordance with an agreement to be negotiated between the parties. |
| 6 | Equity Interests | The equity holders of the Debtor will retain such equity interests. |

## II.   A HISTORY OF BRITESTARR HOMES, INC. AND ITS BANKRUPTCY CASE

### A.   Prior to the Commencement of the Chapter 11 Case.

On or around May 15, 1986, Britestarr was incorporated (as a subchapter S corporation) and all of the outstanding 100 shares of stock were issued to Friema Norkin. On September 7, 1988, Britestarr entered into a loan transaction (the "Loan") with Lloyds Bank PLC ("Lloyds") in which Lloyds loaned Britestarr $4,450,000. A portion of these funds were used to purchase the Oak Point Property from Conrail for $3,167,000.

The Oak Point Property was the former Oak Point Rail Yard, and allegedly contains a significant amount of construction debris deposited, directly or indirectly, by Britestarr and the City of New York, among others. On March 4, 1995, Britestarr, Oak Point Associates and David Norkin (the former president of Britestarr) were assessed a penalty in the amount of $50,000, and were ordered (the "Compliance Order") by the NYS Department of Environmental Conservation to prepare a plan and remediate the Oak Point Property.

On February 15, 1995 and again on August 11, 1995, Britestarr entered into mortgages with Craig W. Galea and Mark C. Kruse for the total principal amount (as stated in the mortgages) of $552,700.00. On December 27, 2000, a judgment entered in the Foreclosure Action in favor of Galea & Kruse establishing a debt in the amount of $1,243,101.00 plus interest (the "Judgement"), and directing a foreclosure sale of the Oak Point Property. Galea & Kruse assert that, to date, interest in the amount of approximately $583,397.00 has accrued on the Judgment and that interest continues to accrue.

Between 1988 and 2002, Britestarr incurred, according to the City of New York, over $2,000,000 in real property taxes. The City claims more than $8,300,000 in interest on those

taxes. The Debtor disputes the City's claim given the City's dumping on the Oak Point Property and the City's failure to properly assess real property taxes against the Oak Point Property.

As of December 31, 1998, ABB Equity Ventures (ABB-EV) entered into a land purchase option with Britestarr as a first step in efforts toward the development of a power generation facility (the "Option Agreement). In exchange for this purchase option, ABB-EV made payments to Britestarr totaling $1,460,000. Britestarr no longer possesses any of the money paid to it by ABB-EV.

On May 21, 2002, Britestarr filed for protection under Chapter 11 of the United States Bankruptcy Code. The case is currently pending in the United States Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court").

B.    Significant Post-Petition Matters.

On June 18, 2002, the two possible claimants to Britestarr's shares agreed to appoint new directors for Britestarr. The shareholders appointed Steven Smith as the sole director of Britestarr. The shareholders also directed Mr. Smith to appoint himself as president of Britestarr. Mr. Smith, an officer of Oak Point Property, Inc. (and, at the time, an employee of ABB-EV) became president of Britestarr on that day. From that day to the present, Mr. Smith has acted as the president of Britestarr.

Also on June 18, 2002, the Bankruptcy Court transferred the venue of the Britestarr bankruptcy case from the United States Bankruptcy Court for the Southern District of New York to the Bankruptcy Court. The bankruptcy case was filed by the law firm of Piper, Rudnick, LLP ("Piper").

On October 1, 2002, Britestarr filed an application to retain Ivey, Barnum & O'Mara, LLC ("IBO") as bankruptcy counsel. On October 28, 2002, Piper filed a motion, as an alleged

4

creditor and not as counsel to Britestarr, to appoint a Chapter 11 trustee in the Britestarr bankruptcy case. Over the objection of Piper, the Bankruptcy Court authorized Britestarr's retention of IBO on March 24, 2003.

On March 18, 2003, Britestarr filed an application to retain the law firm of Stroock & Stroock & Lavan LLP ("Stroock") to represent Britestarr as special counsel to investigate and liquidate Britestarr's debts, if any, to the City of New York. On April 22, 2003, the Bankruptcy Court granted Britestarr's application to retain Stroock.

On March 21, 2003, the Office of the United States Trustee formed an Official Committee of Unsecured Creditors (the "Committee") in the Britestarr case. On April 29, 2003, the Bankruptcy Court approved the Committee's retention of Reid & Riege, P.C. as counsel to the Committee.

On April 15, 2003, the Bankruptcy Court continued Piper's motion to appoint a Chapter 11 Trustee indefinitely. On April 24, 2003, the Debtor filed an objection to Piper's proof of claim.

On June 3, 2003, the Bankruptcy Court authorized Britestarr to retain Caddell & Chapman ("Caddell"). Caddell is a nationally recognized law firm specializing in commercial litigation. Britestarr retained Caddell to commence an adversary proceeding or civil action against David Norkin, Piper (and potentially others) alleging, *inter alia*, malpractice, breach of fiduciary duty, and conversion. On July 31, 2003, Britestarr commenced an adversary proceeding against Piper claiming damages for breach of fiduciary duty and malpractice. Piper has denied the allegations and is defending itself against Britestarr's claims.

III.    **MAJOR ISSUES IN THE BRITESTARR BANKRUPTCY CASE.**

A.    The Oak Point Property.

Britestarr's most valuable asset is the Oak Point Property. On July 26, 2001, Cushman and Wakefield of Connecticut, Inc. ("Cushman and Wakefield") conducted a complete appraisal of this property for ABB Equity Ventures, Inc. ("ABB"). This appraisal placed a value on the Property of approximately $17 million free and clear of encumbrances and environmental issues. Subsequently, a realty company named Friedland Realty advised the Debtor that the Oak Point Property was worth approximately $1 million per acre, or slightly over $20,000,000, free and clear of encumbrances and environmental issues.

With a zoning designation of M3-1, the Oak Point Property is an attractive site for the construction of "heavy-industrial" projects, such as an electricity generating facility. New York City's Waterfront Revitalization Program, authorized by the Federal Coastal Zone Management Act of 1972 and the New York State Waterfront Revitalization and Coastal Resources Act of 1981, has designated the area in which the Property is located as a "Significant Maritime and Industrial Area". Power generation and other industrial and manufacturing uses are specifically cited in the relevant zoning provision as a permitted use "as of right" and in a Waterfront Revitalization Policy as a type of activity that should be supported and encouraged in a "Significant Maritime and Industrial Area."

The Oak Point Property is situated within an existing heavy-industrial area that is buffered from residential areas by a railway (CSX) and a major elevated highway (Bruckner Expressway). In addition, there are no sensitive receptors such as; public schools, hospitals, or recreation facilities located in close proximity to the site. It is adjacent to existing natural gas pipelines and electric transmission lines, has deepwater portage and abuts a working rail yard.

The Oak Point Property benefits from being located within a federally recognized "Empowerment Zone" and a State and City "Economic Development Zone."

    B.    <u>Tax and Environmental Issues of the Oak Point Property</u>.

        1.    <u>The Real Estate Tax Claims of the City of New York</u>.

The taxes assessed against the Oak Point Property for pre-petition taxes claimed by the City of New York are as follows:

### Table 2

### Real Estate Tax Claim of the City of New York

| Period | Principal (As Claimed) | Interest (As Claimed) | Total |
|--------|------------------------|-----------------------|-------|
| 1988/89 | $68,596.00 | $772,845.49 | $841,441.49 |
| 1989/90 | $221,715.00 | $2,156,809.26 | $2,378,524.26 |
| 1990/91 | $169,700.00 | $1,351,516.47 | $1,521,216.47 |
| 1991/92 | $150,142.00 | $965,600.36 | $1,115,742.36 |
| 1992/93 | $150,760.00 | $784,594.20 | $935,354.20 |
| 1993/94 | $148,042.00 | $619,180.24 | $767,222.24 |
| 1994/95 | $143,361.00 | $477,241.50 | $620,602.50 |
| 1995/96 | $142,108.00 | $371,754.93 | $513,862.93 |
| 1996/97 | $140,100.00 | $282,859.75 | $422,959.75 |
| 1997/98 | $138,934.00 | $211,426.96 | $350,360.96 |
| 1998/99 | $139,955.00 | $211,426.96 | $294,809.76 |
| 1999/00 | $136,614.00 | $103,764.10 | $240,378.10 |
| 2000/01 | $136,264.00 | $63,912.44 | $200,176.44 |
| 2001/02 | $138,105.00 | $31,362.92 | $169,467.92 |
| 2002/03 | $54,363.00 | $3,884.89 | $58,247.00 |
| **TOTAL** | **$2,078,759.00** | **$8,408,180.47** | **$10,430,366.38** |

Thus, the total pre-petition debt, classified herein as the "City's secured claim" is, at most, $10,500,000. The Debtor is contesting these claims with the City of New York for the following reasons.

In order to legally exercise its authority to tax real estate, the City of New York is statutorily mandated to correctly enter and identify all real estate it seeks to tax on the official assessment rolls. By law, the City must maintain two distinct assessment rolls. One assessment roll, which must be properly maintained by the City, is referred to as REUC, which stands for

"real estate of utility corporations". The REUC roll is where the City lists property owned by, among other entities, railroads, public utilities, and telecommunications carriers. The roll with which the public is most familiar is referred to as ORE, which stands for "ordinary real estate" The ORE roll must contain all properties, owned by entities other than those listed above, from which the City seeks to collect real estate tax. When the property of an REUC entity such as a railroad is purchased by a private entity, the City must remove that property from the REUC assessment roll, and transfer it to and properly describe it on the ORE assessment roll, as a predicate to taxation.

Further, the City is required to correctly identify on the official tax map all those properties from which it seeks to collect real estate tax. REUC properties must be identified on the official tax map by the unique identification numbers found under the REUC entity's name, which is listed in alphabetical order on the REUC assessment roll. Property owned by a non-REUC entity must be identified on the official tax map under the same conventional borough/block/lot numbering system used to identify that property on the ORE assessment roll. Also, the official tax map maintained by the City must correctly and accurately depict the boundaries for each property in correspondence with the metes and bounds descriptions contained in each owner's deed.

In the case of the Oak Point property, the City failed and refused to comply with the statutory requirements for proper tax assessment and mapping, ignored the facts at its disposal and circumvented its own policies, which resulted in a lack of proper notice to Britestarr of its real estate tax liabilities.

Although the City had actual knowledge of the acquisition of a portion of a larger parcel of property owned by Conrail (the larger parcel referred to herein as the "Oak Point

8

Yard") by the Debtor, the City's ORE assessment roll did not reflect any borough/block/lot identification or assessed value for the Debtor's portion of the Oak Point Yard. An examination of the REUC assessment roll reveals that the City continued to reflect the Debtor's portion as being owned by Conrail, and listed the entire Oak Point Yard in the "Communications" property section of the REUC roll, rather than the "Railroad" or "Transportation" sections. Further, the official tax map never properly reflected the separately owned property of the Debtor. It was only around the time of the filing of the Petition, about 14 years after the Debtor's acquisition of the Oak Point Property, that the City undertook *on its own* to correct the official tax map and assessment rolls, actions which it could have and should have performed on its own in 1988. The City now claims that was a process the Debtor was required to initiate.

Finally, to further excuse its failure to properly assess, map, describe and bill the REUC property and ORE property owned, respectively, by Conrail and the Debtor, the City has indicated that it viewed Conrail as the City's agent for collection of real estate taxes from the Debtor, an arrangement whose legality is questionable.

For these and other reasons, the Debtor believes that the City's asserted real estate tax lien is unenforceable. The City disputes the Debtor's allegations and continues to assert that its tax claim is enforceable. Nonetheless, the Debtor is currently engaged in discussions with the City in an attempt to consensually resolve the City's tax claim. By letter dated November 17, 2003, the Debtor submitted a proposal for such resolution (the "Tax Proposal") to the City. The Tax Proposal is the subject of ongoing discussions between the City and the Debtor. A copy of the Debtor's Tax Proposal is annexed hereto as Exhibit "A". The City has not accepted the Debtor's Tax Proposal. The City and the Debtor are currently negotiating to consensually resolve the tax claim and its treatment.

Should the parties be unable to resolve the City's tax claim consensually, the Debtor, through its special counsel Stroock & Stroock & Lavan will commence an action against the City pursuant to 11 U.S.C. § 505, on the grounds set forth above.

2. <u>The Environmental Claims of the State of New York</u>.

a. The DEC Order.

An Order regarding the Oak Point property was issued on March 4, 1995 for NYS DEC Case No. R2-3324-90-11, In the Matter of Alleged Violations of Article 27 of the New York Environmental Conservation Law and Part 360 of Title 6 of the Codes, Rules and Regulations of the State of New York by Britestarr Homes, Inc., Oak Point Associates and David Norkin.

In the above-captioned administrative enforcement proceeding, the DEC charged the Debtor, Oak Point Associates and David Norkin (the "respondents") jointly and severally, with a series of violations of the Environmental Conservation Law ("ECL"), Article 27.

Following an adjudicatory hearing, and based on a Hearing Report and Recommendations from the Administrative Law Judge who conducted the hearing, the Commissioner of the DEC issued an Order on March 4, 1995 (the "DEC Order") finding the respondents in violation of the ECL and its implementing regulations, and imposed a civil penalty in the amount of $50,000.00 upon the respondents, jointly and severally, including the Debtor. The DEC Order provided that $40,000.00 of the penalty would be suspended on the condition that the respondents pay $10,000.00 to the DEC within thirty (30) days, submit an approvable site investigation plan to the DEC within thirty (30) days, and that the Debtor then proceed to remediate the site under a plan to be approved by the DEC and within the deadlines

10

imposed by the DEC Order. Copies of the DEC Decision and Order is annexed hereto as Exhibit "B."

The DEC Order directed the respondents, within thirty (30) days of the order's service, to provide the DEC with an approvable plan for a site investigation to determine the amount and types of waste that have accumulated at the Oak Point site, the extent to which different kinds of waste have been segregated, and whether and to what extent the site presents an environmental hazard. Upon the DEC's approval of an appropriate investigation plan, the respondents were ordered to undertake the site investigation and report its results, with recommendations for site remediation, to the DEC. The respondents were further ordered to "undertake whatever remediation efforts are required by the DEC Staff, according to a schedule Staff shall set in its remediation directive."

The Debtor paid $10,000.00 to the DEC within thirty days of the Order. In addition, the Debtor filed a site investigation plan within said thirty (30) day period. However, the site investigation plan submitted to the DEC by the Debtor was determined by the DEC not to comply with relevant laws and with the DEC Order, and was not approved by the DEC. The Debtor was directed to submit a modified and approvable plan. No such modified plan has been submitted. In addition, no remediation of the Site has taken place. Moreover, the $40,000.00 portion of the penalty suspended on condition that the respondents comply with the investigation and site remediation requirements of the DEC Order has not been paid. By letter dated December 4, 2003, the Debtor submitted a remediation proposal to the DEC (the "DEC Proposal"). That proposal is the subject of ongoing discussions between the City and the DEC. A copy of the DEC Proposal is annexed hereto as Exhibit "C."

11

The Debtor-in-Possession and/or the Successor will satisfy and discharge the Debtor's obligations under the DEC Order by complying with the requirements of the DEC Order, and by complying with the ECL, its regulations and with all other applicable laws and regulations, and in accordance with a site investigation and remediation plan to be approved by the DEC.1  In so doing, the Debtor-in-Possession will not seek to modify or discharge any portion of the DEC's claim.  The Debtor-in-Possession, or the Successor, will provide the DEC with an approvable plan for a site investigation to determine the amount and types of waste that have accumulated at the Oak Point site, the extent to which different kinds of waste have been segregated, and whether and to what extent waste at the site presents an environmental hazard. Upon the DEC's approval of an appropriate investigation plan, the Debtor-in-Possession and or the Successor will undertake the site investigation and report its results, with recommendations for site remediation, to the DEC.  The Debtor and/or the Successor, will then undertake whatever remediation efforts are required by the DEC, based upon the findings of the site investigation report and consistent with the ECL, and perform said remediation according to a schedule DEC shall set in its remediation directive.  In the event of any perceived conflict or inconsistency between the DEC Order and the ECL, the ECL shall prevail.

If the site remediation plan as approved by the DEC involves any work to be carried out in a regulated wetland or the adjacent area to a wetland, the Debtor shall carry out all such work in strict compliance with all applicable New York state laws and regulations relating to wetlands protection.

Prior to confirmation of the plan, the Debtor will negotiate a resolution of the DEC's penalty claims, including the suspended penalty contained in the DEC Order and

---

1 The Debtor believes that the cost of such remediation will be less than $7 million.

penalties that have accrued since the date of the DEC Order.   The agreed amount will be included in Class 5.

These obligations shall survive Confirmation of a Plan of Reorganization.

## IV.    THE ASSETS AND LIABILITIES OF BRITESTARR.

Britestarr has the following assets with the following approximate values:

### Table 3 -- Assets of Britestarr

| Asset | Liquidation Value2 | Fair Market Value3 |
|-------|-------------------|--------------------|
| Cash | $20,000 | $22,000,000 |
| Oak Point Property | $14,500,000 | |
| Lincoln Navigator | $21,000 | $32,000 |
| BMW 700 Series | $40,000 | $62,000 |
| Claims Against Piper | Unliquidated | Unliquidated |
| Claims Against Norkin | Unliquidated | Unliquidated |
| TOTALS | $14,451,000 | $22,094,000 |

The Debtor has used the best information available to it, its management, and its professionals to prepare these values.  The values are unaudited and are not in all cases based upon current appraisals of Britestarr's assets.  The values of the automobiles are based on retail values from *Kelly Blue Book*.  All of the values listed above are gross values, without any deductions for environmental compliance, costs of sale, taxes, or any other charges whatsoever.

Britestarr's schedules, the register of the proofs of claim against the Britestarr bankruptcy estate, and the information available to the Debtor, reveal the following liabilities of the Britestarr bankruptcy estate:

---

2 Liquidation values are 66% of fair market values.
3 Fair market value assumes that the Oak Point Property is free and clear of all environmental claims, interests, and encumbrances.

**Table 4**
**Liabilities of Britestarr**

| Type | Creditor Name | Estimated Amount |
|---|---|---|
| Administrative | Ivey Barnum & O'Mara | $150,000.00 |
| | Reid & Riege, P.C. | $50,000.00 |
| | Stroock & Stroock & Lavan LLP | $200,000.00 |
| | City of New York | $210,000.00 |
| | US Trustee | $0.00 |
| *Total Administrative* | | *$610,000.00* |
| Secured | City of New York | $10,499,183.55 |
| | Galea & Kruse | $1,243,101.92 – $1,826,498.35 |
| *Total Secured* | | *$11,742,285.47* |
| Unsecured | ABB Equity Ventures Inc. | $5,678,124.64 |
| | Buchanon Ingersoll P.C. | $307,265.31 |
| | Gordon Hale | $25,000.00 |
| | Internal Revenue Service | $200,000.00 |
| | John Nonnemacher | $50,000.00 |
| | Keith Hartley | $55,750.00 |
| | Mark Schwartz | $80,000.00 |
| | Meyers & Harrison, LLC | $11,115.00 |
| | Moshe Mirsky | $14,000.00 |
| | Oak Point Property, Inc. | $20,575,192.89 |
| | Piper Rudnick LLP | $246,634.94 |
| | Smith, Buss & Jacobs, LLP | $324,009.28 |
| | Jeffrey Buss | $5,000,000.00 |
| | State of New York Taxation | $4,689.18 |
| | State of New York DEC | $17,777,500.00 |
| *Total Unsecured* | | *$50,349,281.24* |
| TOTAL | | *$62,341,566.71* |

14

The Debtor contends that not all of the claims listed above are valid in the amount claimed and/or listed above. Nevertheless, Table 4 provides a reasonably accurate description of the potential liabilities of the Debtor.

A.     Liquidation Analysis.

A comparison of Table 3 and Table 4 shows that, absent significant effort, the Britestarr bankruptcy estate has insufficient funds to pay its unsecured creditors in full in a chapter 7 liquidation.[1]  More importantly, if Britestarr were to be liquidated, or if the Oak Point Property were to be foreclosed upon, any entity which acquired the property would be subject to the full costs of environmental remediation of the property.  *See* Part One, Section III B.2, *The Environmental Claims of the State of New York, supra.*  Thus, the DEC's environmental claim affects the value of the Oak Point Property as if it were a secured claim, even though the DEC's claim is technically an unsecured claim under 11 U.S.C. § 506.

When one considers that any potential purchaser would reserve the amount necessary to remediate environmental problems from its offer to purchase the Oak Point Property, it becomes evident that Britestarr has no net value at liquidation.  A likely result from a liquidation sale would be as follows:

---

[1] If Britestarr were to liquidate its assets in the immediate future, the Debtor believes it would receive no more than $14,561,000 for its assets. From this amount, a Chapter 7 trustee's fee must be deducted.  Using the maximum compensation for Chapter 7 trustee's fee under 11 U.S.C. § 326, the Chapter 7 trustee fee is approximately $460,080.00. Table 4 uses a more conservative figure based on a distribution of the vehicles only.

15

## Table 5

### Distributions at Liquidation Values

| Type | Asset/Creditor | Value/Claim Amount | Distribution |
|---|---|---|---|
| Real Property | Oak Point Property | $14,500,000 | |
| | DEC (reduction in purchase price) | ($3,000,000 - $17,700,000) | $3,000,000 - $17,700,000 |
| Personalty | Automobiles | $61,000.00 | |
| *Available For Distribution.* | | | *$61,000.00 - $11,561,000* |
| Secured | City of New York | $10,503,873.00 | $0 - $10,503,873 |
| | Galea & Kruse | $1,243.101.92 | $0 - $966,127 |
| Administrative | Chapter 7 Trustee | $6,175.00 | $6,175 |
| | City of New York | $210,000.00 | $18,874 |
| | Ivey, Barnum & O'Mara | $150,000.00 | $13,481 |
| | Stroock & Stroock & Lavan LLP | $200,000.00 | $17,975 |
| | Reid & Riege, P.C. | $50,000.00 | $4,493 |
| Unsecured | Claims Totaling Approximately $60 Million | | $0.00 or 0% |

As the above liquidation analysis shows Britestarr would have to reduce the environmental claim against it by more than 80%, from the more than $17.7 million to less than $3.0 million, to provide a distribution of a single penny to any unsecured creditor.

*For these reasons, the Debtor believes that a liquidation of the Oak Point Property will yield no distribution, or a very small distribution, to unsecured creditors.*

16

**PART TWO**
**THE PLAN AND THE CONFIRMATION PROCESS**

## I.   THE SUCCESSOR.

The Successor, as more fully described in Schedule 7.1 to the Plan, a copy of which is attached hereto as Exhibit "D" has been formed as a Limited Liability Company pursuant to the Limited Liability Company Law of the State of Delaware. The name of the Successor is "OAK POINT PROPERTY LLC". Oak Point Property LLC is an affiliate of Oak Point Property Inc., the holder of rights to 100% of the equity in the Debtor.

Equity ownership in Oak Point Property LLC shall be divided into units. Each Unit shall have the same rights and preferences and shall be issued to the Members for the consideration set forth in Exhibit "D" hereto. Each Member shall initially hold the number of Units set forth opposite his or her name as further described in Exhibit "D." The units held by each such member shall be subject to the provisions of an Order of the Bankruptcy Court in *In re David Norkin*, Bankruptcy Case No., 97-500543 entered on or about April 11, 2003 and bearing document identification numbers 40-1 and 41-1.

## II.   PLAN FINANCING

The Debtor has received a commitment to lend from Goldman, Sachs & Company. By letter dated February 9, 2004 (the "Commitment Letter"), Goldman Sachs proposed to lend the Debtor up to approximately $11 million. The proceeds of the loan would be used (1) to make certain payments to creditors of Britestarr so that Britestarr can emerge from Chapter 11; (2) to pay the City of New York pursuant to the terms of the plan of reorganization or an agreement with the City of New York; (3) to fund remediation costs in accordance with the DEC Order; (4) to pay the costs of operations for the term of the loan; and (5) to fund certain development costs for the Oak Point Power Project in the discretion of the Successor. A copy of the Commitment

Letter is annexed hereto as Exhibit "E." The Debtor's principal, Steven Smith, and Goldman Sachs are currently negotiating a loan based upon the terms set forth in the Commitment Letter.

The financing for the plan (the "Plan Financing") will be no more than $12 million. An interest reserve of no more than $2.6 million will be established from the loan proceeds. The Plan Financing will be secured by a lien prior to the lien of Galea & Kruse, in whole or in part. The loans will be made according to terms and conditions customary for loans of this type.

As is typical in financing transactions of this nature Goldman Sachs requires a good faith deposit (the "Good Faith Deposit") to cover its out-of-pocket expenses, including a due diligence review. Should the Debtor decide to proceed with Goldman Sachs, it is anticipated that Oak Point Property, Inc., will advance the funds required for the $150,000 Good Faith Deposit to the Debtor and will, in turn, hold an administrative claim of even amount.

In addition to the Goldman Sachs Commitment Letter, the Debtor's principal is actively engaged in ongoing negotiations with three other potential lenders and expects to receive Commitment Letters from at least two of these lenders shortly.

## III.    THE CLOSING DATE

On the Closing Date, the Oak Point Property shall be transferred to the Successor free and clear of all claims, encumbrances and other interests, other than as expressly provided for herein. The Debtor shall take all actions necessary and appropriate to effectuate said transfer. The Closing Date is the first date on which (a) the order confirming the proposed plan is a Final Order, (b) all of the claims against the Debtor's bankruptcy estate are resolved by final orders of this Court, (c) the Debtor and/or the Successor have had a remediation plan approved by the DEC, and (d) the Successor has obtained the Plan Financing.

If the conditions precedent to the Closing Date do not occur within 270 days of the Effective Date, then the Oak Point Property will be sold at auction under the auspices of the Bankruptcy Court as soon as practicable. The auction will be conducted pursuant to orders of the Bankruptcy Court entered after the expiration of the 270 day period following the Effective Date. The proceeds of said auction will be distributed to creditors in accordance with the priority scheme of the Bankruptcy Code, provided however that the Debtor may seek an extension of the 270 day period to satisfy the conditions precedent upon an order of the Bankruptcy Court finding good cause for such an extension, after notice and a hearing, with an opportunity for objections by parties in interest.

## IV.    THE PIPER ACTION.

After confirmation, the Debtor will continue to pursue its pending litigation against Britestarr's prior counsel, Piper Rudnick, LLP in the action *Britestarr Homes, Inc. v. Piper Rudnick, LLP* (the "Piper Action") Adversary Proceeding Number 03-5072. In addition the Debtor will retain the right to pursue any other causes of action possessed by the Debtor after the Petition Date that have not been fully litigated or liquidated prior to the confirmation of the Plan.

The firm representing the bankruptcy estate in the Piper Action, Caddell & Chapman, will receive a 30% contingency fee (absent a settlement).

The Debtor shall continue all litigation in which the Debtor is a plaintiff, including, without limitation, the Piper Litigation, and all contested matters in which the Debtor is a movant. The Net Recoveries of the Post-Confirmation Litigation shall be retained by the Reorganized Debtor. "Net Recoveries" is defined as all monies, property, or rights to or in property of any kind whatsoever received for or on account of the Post-Confirmation Litigation by way of a satisfaction of judgment, settlement, or in any other way whatsoever, less the costs

20

and expenses of the Post-Petition Litigation, including, without limitation, trustee fees, attorney

fees, expert fees, and all other litigation costs.

## V.   THE TREATMENT OF PARTIES IN INTEREST IN THE PROPOSED PLAN.

### A.   Treatment of Administrative Expenses.

The Debtor anticipates the following administrative expenses against the estate:

(1)   Court expenses and fees due to the Office of the United States Trustee estimated to be in the amount of zero dollars (it being presumed that all fees shall be paid immediately prior to confirmation);

(2)   Attorney's fees to Ivey, Barnum & O'Mara, Chapter 11 counsel to the Debtor, estimated to be in the amount of two hundred thousand dollars ($200,000) after application of a retainer received prior to the date of this Plan (subject to Bankruptcy Court approval);

(3)   Attorney's fees to Reid & Riege, P.C., counsel to the Official Committee of Unsecured Creditors, estimated to be in the amount of fifty thousand dollars ($50,000) after application of a retainer received prior to date of this Plan (subject to Bankruptcy Court Approval.);

(4)   Tax Claims for real property taxes owed the City of New York for tax periods for which payments are last payable without interest or penalty post-petition and prior to confirmation in the approximate amount of two hundred ten thousand dollars ($210,000).  Tax claims will be paid in Cash on the Closing Date. The City will retain their lien, if any, until paid in full. The City will then release each such lien.  Alternatively, the City's administrative claim will be paid in accordance with an agreement between the City and the Debtor encompassing all of the claims by the City against the Debtor; and

(5)   Attorney's fee of Stroock & Stroock & Lavan, special tax counsel to the Debtor, estimated to be in the amount of two hundred thousand dollars ($200,000) (subject to Bankruptcy Court approval).

Administrative Expenses shall be paid in such amounts as are agreed by the Debtor

and/or allowed by the Bankruptcy Court and shall be paid, following Allowance, in Cash in the

full amount of the Allowed Administrative Expense, or a lesser treatment in accordance with an agreement with the Debtor.

   B.    Priority and Tax Claims.

   Tax Claims include all Allowed Unsecured Claims of governmental entities allowed priority within the definition of § 507(a)(8), excluding penalties not for actual pecuniary loss. Certain other types of claims also receive priority under § 507(a). The Debtor believes priority claims and tax claims exist, but are in large part secured by liens on the Oak Point Property, or will be waived by agreement. The Debtor also believes that priority tax claims exist in favor of the State of New York and those claims will be paid in full on the Closing Date. Unsecured priority tax claims, if any, will be paid within six (6) years of the dates of assessment of the respective claims, or in cash on the Closing Date, as those alternatives are allowed under § 1129(a)(9). Pursuant to § 1123(a)(1) Tax Claims are not classified and therefore have no right to accept or reject the Plan.

   Because this case was commenced after the enactment of the Bankruptcy Reform Act of 1994, the post-petition liens of accruing tax periods are secured and perfected despite the automatic stay by the application of § 362(b)(18) of the Bankruptcy Code which applies to all cases commenced after October 22, 1994. Nonetheless, post-petition taxes also are administrative expenses under § 503(b) of the Bankruptcy Code. Moreover, interest and penalties due upon administrative taxes also are administrative expenses. 28 U.S.C. §1960. *See Samuel Chapman, Inc. v. New York Creditman's Adjustment Bureau, Inc.*, 394 F.2d 340, 341-2 (2d Cir. 1968). For purposes of the Plan, the Debtor's liability for taxes arising from tax periods for which payments are last payable without interest or penalty post-petition and prior to confirmation are treated as administrative expenses.

Liability for tax periods where payments are last payable without interest or penalty post-confirmation, along with all other rights available under applicable law of both the City and the taxpayer, are unaffected by the Chapter 11 case or confirmation of the proposed Plan of Reorganization.

C.   Classified Claims.

All Claims and Interests shall be divided into the following Classes, which Classes shall be mutually exclusive. The Classification of Claims under the Plan is as follows:

(1)   **Class 1 Claims** shall consist of secured tax liens, which are now all held by the City of New York, comprising all outstanding real property taxes that were last payable without penalty prior to the Petition Date, plus interest thereon to the Petition Date at the rate allowed by state statute, and lien fees incurred prior to the Petition Date. Said claim shall also include interest from the Petition Date through the Confirmation Date at the statutory rate of 18% (on the principal amount of the taxes only). Class 1 is impaired.

(2)   **Class 2 Claims** shall consist of the holders of Secured Claims other than tax liens on the Oak Point Property, namely Galea & Kruse. Class 2 is impaired.

(3)   **Class 3 Claims** shall consist of the holders of Unsecured Claims in excess of $500,000. Class 3 is impaired.

(4)   **Class 4 Claims** shall consist of the holders of Allowed Unsecured Claims in an amount less than or equal to $500,000. Class 4 is unimpaired.

(5)   **Class 5 Claims** shall consist of the enforcement orders of the New York State Department of Environmental Conservation. Class 5 is impaired.

(6)   **Class 6 Claims** shall consist of the holder of the Interests. Class 6 is unimpaired.

D.   Treatment of Classified Claims.

Upon confirmation of the Plan, in full satisfaction of their respective Claims against the Debtor, the respective Classes shall receive the following treatment:

23

**Class 1 Claims (NYC Secured Tax Claim)** -- The holder of an Allowed Class 1 Claim shall be paid in full by the Successor in equal monthly installments over a period of six years at the statutory rate of interest of 18% compounded daily. The NYC Secured Tax Claim may be treated in a different manner pursuant to an agreement between the City of New York and the Debtor subject to approval by the Bankruptcy Court after notice and a hearing with an opportunity for objection by parties in interest. The City shall retain its lien until paid in full or until the City releases its lien by agreement.

**Class 2 Claims (The Secured Claim of Galea & Kruse)** -- The holders of an Allowed Class 2 Claim shall be paid in full by the Successor in monthly installments of principal and interest over ten years with fixed interest at 5.28% according to a 20-year amortization schedule with a balloon payment such that the entire balance outstanding shall be due and payable in the one hundred and twenty first (121st) month. The holders of Allowed Secured Claims in Class 2 (if any) may receive payment in a different manner pursuant to an agreement between Galea & Kruse and Debtor and after Bankruptcy Court approval. Galea & Kruse shall retain their lien on the Oak Point Property until paid, or it releases its lien voluntarily.

**Class 3 Claims (Claims of Oak Point Property, Inc., ABB-EV Inc., and Jeffrey Buss -- Smith, Buss & Jacobs)** -- The holders of Allowed Class 3 Claims shall waive any distribution from the Bankruptcy Estate in exchange for contingent payments from the Successor and its affiliates in an amount no greater than the amount of each such Class 3 Claim. Holders of Class 3 Claims may be treated in a different manner pursuant to an agreement between the claimant and the Debtor after approval by the Bankruptcy Court.

**Class 4 Claims (Convenience Unsecured Creditors)** -- The holders of Allowed Unsecured Claims in Class 4 (if any) will receive payment in full on the later of the Closing Date

24

or Allowance plus interest from the Petition Date to the date of payment at the federal judgment rate of interest applicable on the Petition Date. The Claim of any particular Unsecured Creditor may be treated in a different manner pursuant to an agreement between an Unsecured Creditor and the Debtor after approval by the Bankruptcy Court.

**Class 5 Claims (NYS Environmental Claims)** -- The holder of an Allowed Class 5 claim enforcement orders shall receive compliance with the NYS DEC Order and payment of the DEC's penalty in an agreed upon amount, pursuant to an agreement between the NYS DEC and the Debtor or the Successor.

**Class 6 Interests** - Holders of Interests in Class 6 shall maintain their Interests.

## VI.   OTHER PROVISIONS OF THE PROPOSED PLAN.

A.   Resolution of Disputed Claims and Interests.

The Debtor shall make distributions only to holders of Allowed Claims.

The Debtor is in the process of analyzing the Claims that have been filed with the Bankruptcy Court. The Debtor has objected to the claim of Piper and to the claim of Meyers & Harrison LLC.  The Debtor has determined that it may (if necessary) object to the City of New York Department of Finance's claims for real property taxes (and the administrative claims of the City of New York) to the extent any such Claims assert a right to payment in excess of the amount(s) actually owed by the Debtor.  The Debtor has determined that it may object to the monetary claim of the State of New York's Department of Environmental Conservation, absent agreement.

1.   Objections

The Debtor and any other party in interest may make objections to Claims on or prior to the 20th days after the Effective Date, or such earlier time as the Bankruptcy Court may

fix. Claims as to which an objection has been filed are referred to herein as "Disputed Claims." Any claim not disputed prior to the 21st day after the Effective Date shall be deemed an Allowed Claim as that term is used in the proposed Plan.

To the extent the existence of Disputed Claims would hinder or delay confirmation of the Plan, the Debtor reserves its rights under § 502 (c) of the Bankruptcy Code to have one or more Disputed Claims estimated by the Bankruptcy Court.

2.    Reserves for Disputed Claims

Until such time as a Disputed Claim shall have become an Allowed Claim, the holder of such Disputed Claim shall not participate in any distributions made to other members of its Class. On the Closing Date, the Debtor shall reserve (the "Disputed Claims Reserve"), for the account of each holder of a Disputed Claim, the amount each such creditor would have received if its claim were allowed in full. The Debtor reserves the right to have the Bankruptcy Court estimate the value of the claim for the purpose of establishing this reserve.

3.    Excess Reserves

As each Disputed Claim becomes an Allowed Claim, any cash reserved for, but not distributed to, the holder of such Claim as a consequence of the Allowed Amount of such Claim having been fixed at less than the Face Amount thereof, shall be retained by the Debtor, or the Successor to the Debtor.

B.    Unclaimed Distributions Under the Plan.

Cash, rights, or interests, which are not claimed within 180 days subsequent to its distribution (the "Unclaimed Distribution(s)") pursuant to the Plan shall, on the 181st day (or if said 181st day shall not be a Business Day, then the next Business Day thereafter) subsequent to the attempted distribution, be deemed forfeited, whereupon all right, title, and interest in and to

such property including all interest thereon shall immediately and irrevocably be transferred to the Successor.

You should check the address to which this Disclosure Statement was sent to ensure that it is your correct, current address.

C.    Discharge of Indebtedness.

Except as otherwise provided in the Plan, the confirmation of this Plan shall discharge the Debtor as provided in Section 1141 of the Bankruptcy Code, and shall include, without limitation, a discharge of the Debtor from any debt or Claim of whatever nature that arose before the date of Confirmation, including specifically but not limited to any and all liabilities arising from any mortgage secured by, or lien or other encumbrance on, the Estate assets or other property except as set forth in the Plan, and any debt of a kind specified in §§ 502(f), (g), (h) or (i) of Title 11 of the United States Code, whether or not (i) a proof of claim based on such debt is filed or deemed filed under Section 501 of said Title; (ii) such Claim is allowed under § 502 of such Title; or (iii) the holder of such Claim has accepted the Plan.

D.    Management of the Debtor.

The current president of the Debtor, Steven Smith, shall continue to manage the Debtor's assets subsequent to confirmation of the Plan.

E.    Funding to Implement the Plan.

The Successor will provide the funds necessary to implement the proposed Plan in accordance with the financing agreement discussed in Article II above.

F.    Execution of Necessary Documentation.

The Debtor shall prepare or cause to be prepared any and all documents that are necessary or desirable to implement the proposed Plan.

G.    Retention of Jurisdiction

The Plan provides that the Bankruptcy Court shall retain jurisdiction of the Chapter 11 Case following the Confirmation Date, for the following purposes:

1.    In addition to the continued jurisdiction of the Bankruptcy Court subsequent to the Confirmation Date, which is provided for as a matter of law by the Bankruptcy Code and Bankruptcy Rules, the Bankruptcy Court shall retain jurisdiction for the following purposes:

2.    To fix allowances of compensation;

3.    To determine the classification of any Claim or Interest, the determination of such objections as may be filed to Claims, or Interests, and the reexamination of the allowance of any Claim or Interest;

4.    To determine any and all proceedings to set aside liens or encumbrances, and to recover any preferences, transfers, assets or damages to which the Debtor may be entitled under applicable provisions of the Bankruptcy Code or other federal, state or local law;

5.    To hear and determine (a) all applications for rejection or termination of executory contract(s) filed prior to the Confirmation Date, and (b) all Claims arising from the rejection of any executory contracts, and to consummate the rejection and termination thereof;

6.    To adjudicate all Claims to a security or ownership interest in any property of the Debtor or in any rents, proceeds or profits thereof and to set aside and/or determine the extent and priority of liens or encumbrances;

7.    To adjudicate all Claims or controversies arising out of any purchases, sales or contracts made or undertaken by the Debtor during the pendency of the Chapter 11 Case, including those effected by the confirmation of this Plan;

28

8.    The Bankruptcy Court shall have exclusive jurisdiction to determine all questions and disputes regarding title to the Debtor's assets, and determination of all causes of action, controversies, and disputes or conflicts, whether or not subject to actions pending as of the Confirmation Date, between the Debtor and any other party, including, but not limited to, any right of the Debtor to recover assets pursuant to the provisions of Bankruptcy Code;

9.    To recover assets wherever located, or judgments by reason of preferences, transfers of assets or damages to which it may be entitled under applicable law;

10.    To correct of any defect, cure any omission, or reconcile any inconsistency in this Plan or the Confirmation Order as may be necessary to implement the purposes and intent of this Plan;

11.    To enforce and interpret the terms and conditions of this Plan and any settlement agreement annexed hereto and to determine all controversies and disputes arising under or in connection with this Plan or any settlement agreement annexed hereto; subject to the sole exception that to the extent any settlement agreement as between the DEC and the Debtor requires interpretation of the ECL or any provision of New York state laws and/or regulations, disputes with respect to such statutory interpretation shall be subject to the sole and exclusive jurisdiction of the Courts of the State of New York;

12.    To modify this Plan subsequent to the Confirmation Date, pursuant to the Bankruptcy Code and Rules;

13.    To adjudicate and determine any cause of action provided for under this Plan or the Confirmation Order including, without limitation, the Post-Confirmation Litigation, and any and all claims under § 505 of the Bankruptcy Code;

29

14.    To determine such other matters as may be set forth in the Confirmation Order or for which relief may be granted under the Bankruptcy Code or Bankruptcy Rules;

15.    To enter any order, including injunctions, necessary to enforce title, rights and power of the Debtor and to impose such limitations, restrictions, terms and conditions of such title, rights and powers as this Bankruptcy Court may deem appropriate;

16.    To hear any matter brought on by proper application by a Claimant or holder of an Interest claiming that payments or distributions pursuant to this Plan have not been properly made, in terms of the amount, timing, or otherwise;

17.    To make such other orders as are necessary or appropriate to implement the provisions of this Plan;

18.    To enter a Final Order closing the Chapter 11 Case; and

19.    To implement the provisions of this Plan in the manner provided under § 1142(a) and (b) of the Bankruptcy Code.

H.    Retention of Property.

All property of the bankruptcy estate shall revest in the Debtor upon the Effective Date of the Plan, subject only to the liens, encumbrances, claims, and interests specifically provided for in this Plan. After the bankruptcy estate has made all distributions required by the Plan, all property remaining with the Debtor shall be transferred to the Successor free and clear of all liens, claims, encumbrances, or interests whatsoever.

I.    Tax Consequences.

THIS DISCUSSION DOES *NOT* ADDRESS THE PARTICULAR FEDERAL INCOME TAX CONSEQUENCES THAT MAY BE RELEVANT TO CERTAIN TYPES OF TAXPAYERS SUBJECT TO SPECIAL TREATMENT UNDER THE FEDERAL INCOME

30

TAX LAWS (SUCH AS LIFE INSURANCE COMPANIES, TAX-EXEMPT ORGANIZATIONS AND TAXPAYERS WHO ARE NOT U.S. DOMESTIC CORPORATIONS OR CITIZENS OR RESIDENTS OF THE UNITED STATES), NOR DOES IT DISCUSS ANY ASPECT OF STATE, LOCAL, FOREIGN OR OTHER TAX LAWS THAT MAY BE APPLICABLE TO PARTICULAR TAXPAYERS. THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND INTERESTS MAY VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER AND MAY BE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE LAW. NO RULING HAS BEEN SOUGHT OR OBTAINED FROM THE IRS WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN, AND NO OPINION OF COUNSEL HAS BEEN REQUESTED OR OBTAINED BY THE DEBTOR WITH RESPECT TO ANY SUCH ASPECTS. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES OF THE PLAN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES REGARDING THE CONFIRMATION OF THE PLAN OR A LIQUIDATION OF THE DEBTOR'S ASSETS.

J.    Risks Inherent in the Plan.

The Debtor is confident that it can reduce or eliminate the encumbrances on the Oak Point Property and resolve the environmental claims against the Oak Point Property, and thereby provide such payment to its creditors. The Debtor believes that without such a reduction and/or elimination, the bankruptcy estate and the Debtor have and will have no funds to pay to creditors.

31

However, the Debtor has reached no agreements with its secured creditors or the NYC DEC at this time.

The Debtor has received offers to provide funding of up to $10,000,000 for, *inter alia*, it reorganization. The Debtor is currently negotiating the terms under which the funding will be provided to obtain the most favorable for the Debtor.

NOTHING HEREIN MAY BE DEEMED AS A GUARANTEE OR ASSURANCE OF FUTURE PERFORMANCE, OR OF THE EXISTENCE OR NON-EXISTENCE OF ANY FACT OR CIRCUMSTANCE NOT EXPLICITLY STATED IN THIS DISCLOSURE STATEMENT OR THE PROPOSED PLAN OF REORGANIZATION.

## VII.    CONDITIONS PRECEDENT TO THE IMPLEMENTATION OF THE PLAN

It shall be a condition precedent to the effectiveness of the Plan, and to the disbursement of any payments pursuant to the Plan, that on or prior to the Confirmation Date the Bankruptcy Court shall have entered one or more Final Orders which shall, among other things, by grant, decree or adjudication, confirm the Plan. Finally, as to any claims or expenses that otherwise would receive disbursement pursuant to the Plan on or after the Confirmation Date, no disbursement shall be made unless and until either (a) the Claim or Expense is not disputed in a timely fashion, or (b) any objection is determined by Final Order and the claim becomes an Allowed Claim.

## VIII.    THE CONFIRMATION PROCESS FOR THE PROPOSED PLAN

A.    In General.

Britestarr has filed its Plan with the Bankruptcy Court. A copy of the Plan is contained in the materials forwarded to you along with this Disclosure Statement. The Debtor has filed its

32

Disclosure Statement with the Bankruptcy Court pursuant to § 1125 of the Bankruptcy Code and in connection with the solicitation of acceptances of the Plan.

The Bankruptcy Court approved this Disclosure Statement as containing "adequate information" for creditors and holders of interests in the Debtor in accordance with § 1125(b) of the Bankruptcy Code as set forth in an order of the Court also served upon you with this Statement. Pursuant to § 1125(a)(1) of the Bankruptcy Code, "adequate information" is defined as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant Class to make an informed judgment about the Plan," and whether to accept or reject the Plan.

Approval of this Disclosure Statement does not indicate that the Bankruptcy Court recommends either acceptance or rejection of the Plan. No statements or information concerning the Debtor or the Plan have been authorized, other than the statements and information set forth in this Disclosure Statement.

B.    The Confirmation Hearing and the Ballot.

The Bankruptcy Court has scheduled a hearing to confirm the Plan at the date and time set forth in the Order Approving the Disclosure Statement. The hearing shall occur at the United States Bankruptcy Court, 915 Lafayette Boulevard, Room 123, Bridgeport, Connecticut. The hearing may be adjourned from time to time without further notice other than by announcement in Bankruptcy Court on the scheduled date of such hearing.

A Ballot form for reflecting the vote of all holders of Claims or Interests in any of the Classes listed below (a "Claimant") should be included in the materials forwarded to you along

33

with this Disclosure Statement.  If a Ballot is not included in the materials forwarded to you and you believe you are a Claimant, you should contact the counsel to the Debtor at the following office:

> Ivey, Barnum & O'Mara, LLC
> 170 Mason Street
> Greenwich, CT 06830
> Attn: Melissa Zelen Neier, Esq.
> Telephone: (203) 661-6000

Every reasonable effort has been made in this Disclosure Statement to explain fully the various aspects of the Plans as they affect all Claimants and Holders of Interests.

C.     Who May Vote and Instructions for Voting.

A holder of an Impaired Claim or Interest is entitled to vote its Claim or Interest to accept or reject the Plan and such vote is important.  Generally a Claim that will not be paid in full is considered "Impaired".  A more detailed definition is set forth in Bankruptcy Code § 1124. Under the Plan, Claimants in Classes 1, 2, 3, and 5 are Impaired and may vote.

The holder of an Impaired Claim, after carefully reviewing this Disclosure Statement, including the Plan and other exhibits attached hereto, should indicate acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot, and returning the Ballot to the attorneys for the Debtor, Ivey, Barnum & O'Mara, LLC 17 Mason Street, Greenwich, CT, 06830 Attn: Melissa Zelen Neier, Esq.  Such Ballot must be filed with the attorneys for the Debtor by the date and time stated on the order approving this Disclosure Statement.  Any Ballots received by the Debtor's attorneys subsequent to said date and time, will not be counted.

Any questions regarding the procedures for voting on the Plan should be addressed to Ivey, Barnum & O'Mara, LLC 170 Mason Street, Greenwich, Connecticut, 06830 Attn: Melissa Zelen Neier at (203) 661-6000.

34

The Debtor has expended considerable time and effort in examining the Debtor's finances and developing a Plan which it anticipates will provide the best return to the Claimants. Accordingly, the Debtor recommends that the Claimants vote in favor of approving the Plan.

**SUBSEQUENT TO REVIEWING THIS DISCLOSURE STATEMENT AND ITS APPENDICES, PLEASE INDICATE YOUR VOTE ON THE ENCLOSED BALLOT AND RETURN IT NO LATER THAN THE DATE AND TIME REFLECTED ON THE ORDER APPROVING THE DISCLOSURE STATEMENT. IF YOU HOLD CLAIMS OR INTERESTS IN MORE THAN ONE CLASS (AS CLASSIFIED IN THE PLAN), YOU MAY RECEIVE A SEPARATE BALLOT FOR EACH SUCH CLAIM OR INTEREST OR YOU MAY COPY THE BALLOT AND SUBMIT A SEPARATE BALLOT FOR EACH CLASS IN WHICH YOU HOLD A CLAIM OR INTEREST.**

D.    Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, subsequent to notice, to hold a hearing on confirmation of a Plan. The Order of the Bankruptcy Court served upon you with this statement recites the date and time for the commencement of such hearing. The hearing shall occur at the United States Bankruptcy Court, 915 Lafayette Boulevard, Bridgeport, Connecticut. The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the confirmation hearing or any adjournment thereof.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a Plan. Any objection to confirmation of the Plan must be made in writing and served upon, and received by counsel to the Debtor, and filed with the Bankruptcy Court, together with proof of service by the date and time set forth in the Order of the Bankruptcy Court

35

served upon you with this Disclosure Statement. Counsel to the Debtor upon whom objections must be served is: Melissa Zelen Neier, Esq., Ivey, Barnum & O'Mara, LLC 170 Mason Street, Greenwich, Connecticut 06830.

Bankruptcy Rule 9014 governs objections to confirmation of the Plan. **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

    E.    <u>Requirements for Confirmation of the Plan</u>.

At the confirmation hearing, the Bankruptcy Court shall determine whether the Bankruptcy Code's requirements for confirmation of the Plan have been satisfied, in which event the Bankruptcy Court shall enter an order confirming the Plan. These requirements are set forth in § 1129(a) of the Bankruptcy Code.

The Debtor believes that the holders of all Claims and Interests impaired under the Plan will receive rights, payments or distributions under the Plan having a present value as of the Effective Date in an amount much greater than the amounts likely to be received by such holders if the Debtor were liquidated in a case under Chapter 7 of the Bankruptcy Code. At the Confirmation Hearing, the Bankruptcy Court will determine whether Claimants would receive less in a liquidation under Chapter 7, than they would under the Plan.

The Debtor also believes that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successors to the Debtor under the Plan.

F.    Satisfaction of Requirements of Confirmation of Plan.

The Plan must be found to comply with each of the applicable provisions of §1129 of the Bankruptcy Code. Two of these requirements are the best interest of creditors or liquidation test and feasibility.

1.    Best Interests of Unsecured Creditors and Holders of Interests.

Notwithstanding acceptance of the Plan by one or more impaired Classes of claims and Interests sufficient to confirm the Plan, the Bankruptcy Court must independently determine that the Plan is in the best interests of all Classes of Creditors and holders of interests. Under this "best interests" test, the Bankruptcy Court must find that the Plan provides to each member of each Impaired Class of Claims and Interests a recovery which has a present value at least equal to the present value of the distribution which each such member would receive from the Debtor if the Debtor was instead liquidated under Chapter 7 of the Bankruptcy Code.

To calculate what members of each Impaired Class of Claims and Interests would receive if the Debtor were liquidated, the Bankruptcy Court must first determine the dollar amount that would be generated from the liquidation of the Debtor ("Liquidation Fund"). The Liquidation Fund of the Debtor would consist of the proceeds from the disposition of the assets of the Debtor, augmented by the Cash held by the Debtor and recoveries on actions against third parties. The Liquidation Fund would then be reduced by the costs of the liquidation. The Debtor's costs of liquidation under Chapter 7 would include the fees of a Chapter 7 trustee, as well as those of counsel and other professionals who or which will be retained by the Debtor's trustee and various other costs that might include selling expenses; any unpaid expenses incurred by the Debtor during the Chapter 11 Case (such as fees for attorneys, and accountants) which would be Allowed in the Chapter 7 proceeding; and Claims arising from the trustee's rejection of

37

obligations incurred by the Debtor during the pendency of the Chapter 11 Case. These Claims would need to be paid in full out of the Liquidation Fund prior to any amount of the Liquidation Fund being made available to pay Unsecured Claims. Additionally, under Chapter 7, a Secured Creditor whose Claim is fully Secured would be entitled to full payment, including interest, from the proceeds of the sale of its collateral. Unless its Claim is nonrecourse, to the extent a Secured Creditor's collateral is insufficient to pay its Claim in full, the Creditor would share remaining assets with other General Unsecured Creditors. The present value of the distributions out of the Liquidation Fund (after subtracting the amounts described above) are then compared with the present value of the property offered to each of the Classes impaired under the Plan to determine if the Plan is in the best interests of each Creditor.

Because of the additional costs associated with a Chapter 7 liquidation, the Debtor has concluded that a liquidation would result in a lesser distribution to Creditors than that provided for under the Plan. In fact, there would be no funds available for the unsecured creditors or even for Administrative Expense holders.

**THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE GREATEST AND EARLIEST POSSIBLE RECOVERY TO CREDITORS. THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTEREST OF CREDITORS.**

2.    Feasibility.

Under § 1129(a)(11) the Bankruptcy Code, a Plan of Reorganization may not be confirmed unless the Bankruptcy Court finds that confirmation of the proposed Plan is not likely to be followed by either the liquidation of the reorganized debtor or the need for further financial reorganization of the Debtor or its successor, unless so provided for in the Plan.

38

The Debtor does not anticipate difficulty in performing its obligations under the Plan as the Successor has sufficient funds to make all of payments required by the Plan. The members shall contribute as necessary to both post-confirmation operations and Plan disbursement.

3.   Impairment.

A Class of Claims or Interests is Impaired under a Plan of Reorganization unless, treatment of the Class is consistent with any of the provisions of § 1124 of the Bankruptcy Code. In essence, a class of claims or interests is impaired unless the claim holders' or interest holders' rights are unchanged by the Plan or unless the Plan cures a default in the pre-petition obligations to the holders of claims or interests in the class and reinstates the original terms.  If any Class is impaired under the Plan, at least one impaired Class must be found to have voted to accept the Plan in order for the Court to find that the Plan could be confirmed.

G.   Vote Required for Class Acceptance.

Section 1126 of the Bankruptcy Code defines acceptance of a Plan by a Class of Claims as acceptance by holders of at least two-thirds in amount, and more than one-half in number, of the Claims of that Class that actually cast ballots for acceptance or rejection of the Plan.  Thus, Class acceptance takes place only if two-thirds in amount and a majority in number of the holders of Claims voting case their Ballots in favor of acceptance.  As to acceptance of a Plan by a Class of holders of equity Interests, such Class is deemed to have accepted the Plan when at least two-thirds of the amount of the outstanding Interests actually voting have voted to accept the Plan.

H.    Cramdown.

Pursuant to § 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm a Plan despite the non-acceptance of the Plan by an impaired class. This procedure is commonly referred to as a "cramdown". Section 1129(b) provides that upon the request of the proponent of a Plan, the Bankruptcy Court shall confirm the Plan despite an impaired class's failure to accept a Plan if: (a) the Plan does not discriminate unfairly with respect to each impaired class of claims or interests that has not accepted the Plan; (b) the Plan is "fair and equitable" with respect to each impaired non-accepting class; and (c) at least one impaired Class has accepted the Plan.

"Fair and equitable" has different meanings with respect to the treatment of secured and unsecured claims. These descriptions are set forth in § 1129(b)(2) of the Bankruptcy Code.

If the ballots are cast so as to require the Debtor to seek confirmation by application of § 1129(b), the Debtor will ask the Bankruptcy Court will determine at the confirmation hearing whether the Plan is fair and equitable with respect to, and does not discriminate unfairly against, any rejecting impaired Class of Claims or Interests.

IX.    MODIFICATION OF THE PLAN.

The Debtor may propose amendments or modifications of the proposed Plan at any time prior to confirmation, with approval of the Court. After confirmation, the Debtor may, with the approval of the Court and so long as it does not materially or adversely affect the interest of creditors, remedy any defect or omission or reconcile any inconsistencies in the Plan, or in the Order of Confirmation, in such manner as may be necessary to carry out the purposes of the Plan.

## X.    CONCLUSION

The Debtor has proposed this Plan in good faith, consistent with the interests of all creditors and others who may have an interest in this matter.  The Debtor has set forth, in this Disclosure Statement and proposed Plan of Reorganization, adequate information to enable any holders of claims or interests to make an informed judgment about the Plan.  The Debtor therefore submits this information, along with the Debtor's proposed Plan of Reorganization.


**[THE REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**[SIGNATURES ARE ON FOLLOWING PAGE]**

BRITESTARR HOMES, INC.

By _Ste E Smith_

Steven E. Smith, President

COUNSEL TO THE DEBTOR:

By: _____

Melissa Zelen Neier, Esq.
Federal Bar No. 25055
Ivey, Barnum & O'Mara, LLC
170 Mason Street
Greenwich, CT 06830
Phone:      (203) 661-6000
Facsimile: (203) 661-9462
Email:      mneier@ibolaw.com

42

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF CONNECTICUT

IN THE MATTER OF

Britestarr Homes, Inc.

CASE NO. 02- 50811

**DEBTOR(S)**

ADV. NO.

DOC. # Second Amended Disclosure Stmt.

CLAIM #

# SUBSTITUTION FORM

The attachments to this document were not imaged.
If these attachments need to be reviewed and/ or copied,
please refer to the original case file.

DEBORAH HUNT
CLERK OF COURT